Peggy Hunt (Utah State Bar No. 6060)
Chris Martinez (Utah State Bar No. 11152)
Nathan Seim (Utah State Bar No. 12654)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
       martinez.chris@dorsey.com
       seim.nathan@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH CENTRAL DIVISION**

| | |
|---|---|
| R. WAYNE KLEIN, as Receiver,<br><br>        Plaintiff,<br><br>vs.<br><br>HARVEST TIME MINISTRIES, INC., a Nevada Corporation,<br><br>        Defendant. | **COMPLAINT**<br><br>**(Ancillary to Case No. 2:12-cv-00591)**<br><br>Civil No. _____ |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver" or "Plaintiff") of National Note of Utah, LC ("National Note"), its subsidiaries and affiliates (collectively, unless otherwise stated, National Note and all subsidiaries and affiliated entities are referred to herein as "NNU"), and the assets of Wayne LaMar Palmer ("Palmer"), in the case styled as *Securities and Exchange Commission v. National Note of Utah, LC et al.*, Case No. 2:12-cv-00591 (D. Utah) (Jenkins, J.) (the "SEC Civil Enforcement Case"), hereby files this Complaint against Harvest Time Ministries, Inc. and states, alleges and avers as follows:

## PARTIES

1. Pursuant to an Order Appointing Receiver and Staying Litigation entered on June 25, 2012 in the SEC Civil Enforcement Case (the "<u>Receivership Order</u>"),[1] Plaintiff is the duly-appointed Receiver for National Note and Palmer "together with any and all subsidiaries and affiliated entities of National Note and Palmer. . . ."[2]

2. On information and belief, defendant Harvest Time Ministries, Inc. is a Nevada corporation.

## JURISDICTION AND VENUE

3. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §1367.

4. The Court has personal jurisdiction over Defendant.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 754.

## FACTUAL BACKGROUND

*National Note's Operation as an Alleged Ponzi Scheme*

7. On June 25, 2012, the Securities & Exchange Commission filed a complaint (the "<u>SEC Complaint</u>") against National Note in Case No. 2:12-cv-00591. Docket No. 1.

8. The SEC Complaint alleges that Defendant Wayne Palmer ("<u>Palmer</u>") operated National Note as a "Ponzi scheme" and asserts various causes of action for securities fraud.

9. Specifically, the SEC Complaint states that from at least 2004, Palmer solicited and raised more than $100 million from over 600 "investors." SEC Complaint ¶ 1.

10. Additionally, the SEC Complaint states that Palmer represented to investors that National Note purchased and sold collateralized loans, as well as funded, managed and sold real

---

[1] SEC Civil Enforcement Case, Docket No. 9.

[2] *Id.* (Receivership Order, pp. 1-2).

property, and due to National Note's expertise and knowledge in these areas, the company was able to generate significant returns and guarantee investors at least a 12% return.  *Id.* ¶ 2.

11. According to the SEC Complaint, however, at all times relevant hereto, National Note was insolvent and unable to make investor payments according to its contractual terms.  As such, National Note paid investors from the investment funds of new investors.  *Id.* ¶ 4.

*National Note's Investment Scheme*

12. National Note represented to investors that their investment in National Note would be secured by real property.  National Note did not own real property sufficient to secure these investments.  Accordingly, National Note devised a scheme pursuant to which National Note would purport to grant security to investors, when in truth, National Note would take investors' money and give them no security in return.  National Note's scheme was as follows.

13. First, National Note would lend money to an affiliated entity (the "Affiliate"). The Affiliate would execute a promissory note, pursuant to which it agreed to repay the loan to National Note (the "Affiliate Note").  The Affiliate Note would then be secured by a Trust Deed executed by the Affiliate in favor of National Note (the "Affiliate Trust Deed").

14. National Note then solicited money from investors by promising that their investment would be secured by Assignments of Beneficial Interest in Trust Deed (the "ABIs"). The ABIs purported to assign National Note's "right, title and interest" in the Affiliate Trust Deed.  National Note did not assign its interest in the Affiliate Note to the investors.  The following diagram shows National Note's scheme:



15.     The investors purportedly received an assignment of National Note's secured interest in real property.  This secured interest gave National Note the right to foreclose on the underlying real property if the Affiliate defaulted on the Affiliate Note.  If, however, the Affiliate never defaulted and the Affiliate Note was paid, the Affiliate Trust Deed was cancelled and the secured interest disappeared.

16.     The Affiliate was not a party to any of the ABIs and there was no privity of contract between the Affiliate and the investors.  Accordingly, there was no contract pursuant to which the Affiliate was obligated to pay the Affiliate Note payments to the investors instead of National Note.  Moreover, the ABI did not assign National Note's rights under the Affiliate Note to the investors.  Accordingly, the ABI did not give the Investor the right to demand payment under the Affiliate Note.

17.     The end result of this scheme was that the investors received no security at all.  If National Note breached its agreement with the investor, the investor had no foreclosure rights as a result of the assignment of National Note's interest in the Affiliate Deed of Trust, because the Affiliate Deed of Trust was security for the Affiliate Note, not the agreement between National Note and the investors.

4818-5040-0275\2

*Harvest Time Ministries Invests $100,000.00 With National Note*

18. In 2006, Harvest Time Ministries invested $100,000.00 with National Note. This was documented in a Promissory Note (the "Harvest Note").

19. The Harvest Note accrued interest monthly and by January 1, 2008, the amount owed on the Harvest Note was $123,887.41. National Note documented this higher amount owed with a new Promissory Note (the "Revised Note").

20. Consistent with the financing scheme outlined above, neither the Harvest Note nor the Revised Note was secured by a deed of trust. Instead, on January 9, 2008, National Note executed an Assignment of Beneficial Interest in Trust Deed in favor of Harvest Time Ministries (the "Harvest ABI"). The Harvest ABI purported to assign National Note's interest in a Trust Deed for real property in Malad, Idaho - specifically Lot 48 of the Elkhorn Ridge Estates ("Elkhorn Lot 48"). This Trust Deed was executed by Elkhorn Ridge, LLC in favor of National Note (the "NNU Lot 48 Trust Deed"). The NNU Lot 48 Trust Deed was security for a $250,000 loan between National Note and Elkhorn Ridge, LLC (the "NNU Lot 48 Note"). National Note did not assign its beneficial interest in the NNU Lot 48 Note to Harvest Time Ministries. The following diagram illustrates the transactions:



4818-5040-0275\2

21. National Note did not execute a trust deed for Elkhorn Lot #48 in favor of Harvest Time Ministries. Moreover, Elkhorn Ridge, LLC is not a party to the Harvest ABI. Indeed, there is no privity of contract between Elkhorn Ridge, LLC and Harvest Time Ministries. Finally, the Harvest ABI did not assign National Note's rights under the NNU Lot 48 Note to Harvest Time Ministries. Accordingly, the Harvest ABI did not give Harvest Time Ministries the right to demand payment under the NNU Lot 48 Note.

22. All that Harvest Time purported to receive through the Harvest ABI was an assignment of National Note's security interest in the NNU Lot 48 Trust Deed. National Note's security interest merely gave National Note the right to foreclose on Elkhorn Lot 48 if Elkhorn Ridge, LLC defaulted on the NNU Lot 48 Note. If, however, Elkhorn Ridge, LLC never defaulted and the NNU Lot 48 Note was paid, the NNU Lot 48 Trust Deed was cancelled and the secured interest disappeared, regardless of whether National Note defaulted on the Revised Note.

23. Conversely, the Harvest ABI gave Harvest Time Ministries no right to foreclose on Elkhorn Lot 48, had National Note defaulted on the Revised Note. This is because the NNU Lot 48 Trust Deed did not secure the Revised Note. Accordingly, as a matter of law and fact, the Harvest ABI gave no security to Harvest Time Ministries. The Revised Note was nothing more than an unsecured note.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment against Harvest Times Ministries)

24. The Receiver incorporates by reference herein all previous paragraphs of this Complaint.

25. An actual controversy has arisen between the Receiver and Harvest Time Ministries regarding the enforceability of the Harvest ABI.

26. The Receiver is entitled to a declaratory judgment that:

   a. The Harvest ABI is invalid and never gave Harvest Time Ministries any security for its investment with National Note.

27. A judicial declaration is necessary and appropriate at this time under the circumstances in order that the respective rights and duties of the parties may be determined.

## PRAYER FOR RELIEF

WHEREFORE, the Receiver prays for relief as follows:

1. On its First Cause of Action, for an Order and Judgment declaring that:

   a. The Harvest ABI is invalid and never gave Harvest Time Ministries any security for its investment with National Note.

2. For such other and further relief as the Court deems just and proper.

DATED this 6th day of August, 2013.

**DORSEY & WHITNEY LLP**

  */s/ Peggy Hunt*
Peggy Hunt
Chris Martinez
Nathan Seim
*Attorneys for Receiver*